UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
MICHAEL L. SLAUGHTER,                        :
                                             :
                          Plaintiff,         :
                                             :           **MEMORANDUM AND OPINION**
            -against-                        :                10-CV-3428(DLI)
                                             :
MICHAEL J. ASTRUE,                           :
Commissioner of Social Security,             :
                                             :
                          Defendant.         :
----------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

Plaintiff Michael L. Slaughter filed an application for disability insurance benefits ("DIB") under the Social Security Act (the "Act") on December 6, 2006, alleging a disability that began on August 1, 2006. Plaintiff's application was denied initially and on reconsideration. Plaintiff testified at a hearing held before an Administrative Law Judge ("ALJ") on August 1, 2008. By a decision dated September 17, 2008, the ALJ concluded that plaintiff was not disabled within the meaning of the Act. On May 27, 2010, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review.

Plaintiff filed the instant appeal seeking judicial review of the denial of benefits, pursuant to 42 U.S.C. § 405(g). The Commissioner now moves for judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c), seeking affirmation of the denial of benefits. (*See* Gov't Mot. for Judg., Doc. Entry No. 13.) Plaintiff cross-moves for judgment on the pleadings, seeking reversal of the Commissioner's decision, or alternatively, remand. Plaintiff contends that the ALJ failed to (i) properly follow the treating physician rule, (ii) properly evaluate Slaughter's credibility, and (iii) properly evaluate vocational expert testimony. (*See* Pl. Mot. for Judg., Doc. Entry No. 15.)

For the reasons set forth more fully below, the Commissioner's motion is denied, and plaintiff's motion is granted in part and denied in part. Plaintiff's motion for judgment on the pleadings is denied. While the Court finds that the ALJ properly applied the treating physician rule and properly assessed plaintiff's credibility, the case is remanded for additional proceedings, specifically for the ALJ to take testimony from the vocational expert and for the plaintiff to submit updated medical records.

## BACKGROUND

### A. Non-medical and Testimonial Evidence

On August 1, 2008, plaintiff appeared with counsel and testified before ALJ Jeffrey Jordan. (R. 7-42.)[1] At the time of his testimony, plaintiff was fifty-one years old. (R. 12,) He has a ninth-grade education and worked for the past twenty-two years as a bus driver for the Metropolitan Transit Authority ("MTA").[2] (R. 15, 17.) In June 2006, plaintiff stopped working as he was taken to the hospital with a bad headache and an inability to see out of his left eye. (R. 17-18.) Plaintiff testified that he felt he was disabled due to complete blindness in his left eye and blurry vision in his right eye. (R. 19-20.) Plaintiff has a driver's license, but does not drive because his doctor advised against driving. (R. 20.)

Plaintiff testified that he suffers from Type II diabetes and that this illness has resulted in many medical issues. (R. 22.) Plaintiff suffers from chronic headaches and takes a medication to alleviate this symptom. (R. 20-22.) Plaintiff suffers from a need for frequent urination, as well as dizziness and "shaking" in the morning. (R. 22-23.) Diabetes has affected his circulation

---

[1] "R." refers to the record in this case, which was submitted in conjunction with the government's motion.
[2] For the last three years of his tenure with the MTA, plaintiff worked in the maintenance department, cleaning buses during shift changes. (R. 18-19.) He testified that the MTA reassigned him due to his diabetes and a fear that he might suffer from blackouts while transporting MTA passengers. (R. 19.)

and he regularly suffers from swollen ankles and itchy skin. (R. 31-33.) Plaintiff treats his diabetes with insulin and dieting. (R. 22.)

Plaintiff's activities are limited by his illness. He does not participate in household chores or cook. (R. 25.) He listens to the radio but does not watch television. (R. 25-26.) He is not able to read unless he wears his glasses. (R. 26.) He does not watch television or read regularly because he does not want to strain his right eye or risk any further decline of vision in that eye. (R. 29.)

Plaintiff's testimony regarding his use of his right eye is contradictory at times. He stated that, "if I put my glasses on, I can read." (R. 26, 40.) Yet, he does not shop for groceries on his own because he does not trust his vision enough to determine whether he has paid proper prices for groceries or received proper change from the cashier. (R. 29-30.) He later indicated that, although he can read with his glasses on, reading strains his right eye, and, thus, he cannot read regularly. (R. 39, 41.) Apparently, he suffers from residual blurriness, even when he wears his glasses. (R. 27, 38-39.) With glasses, he is able to read street signs while riding a bus as a passenger; however, he usually sits near the bus driver and asks the driver to let him know when he has arrived at his destination. (R. 27-28.) He does not trust his vision, even while wearing glasses, to arrive at a destination without assistance from the bus driver. (R. 28.)

Donald Slive, a vocational expert ("VE"), also testified at the hearing. (R. 33-39.) The VE testified that plaintiff could not perform his past relevant work as a bus driver or as a bus maintenance employee because those positions required good bilateral vision, which plaintiff lacks. (R. 34.) The VE identified two positions of light exertion levels (small products assembler and power screwdriver operator), for which there are ample positions in the local and national economies. (R. 35.) The VE testified that a hypothetical job seeker with plaintiff's

3

medical constraints could perform these jobs. (*Id.*) On cross-examination, when asked whether a hypothetical job seeker with blindness in the left eye and blurry vision in the right eye could perform these jobs, the VE stated that such an individual could. (R. 36.) However, when questioned whether a hypothetical job seeker with blindness in the left eye and "an extreme impairment" in the right eye could perform these jobs, the VE stated that such an individual could not. (R. 37-38.) The VE further stated that an individual with blindness in one eye and an extreme impairment in the other eye would not be able to find work. (R. 38.) The ALJ then asked whether, "[b]ased on [plaintiff's] testimony today that he is blind in his left eye and he is able to read and see a monitor," would plaintiff be able to perform work that exists in the national economy?" (R. 38.) The VE stated that such an individual would be able to perform the two positions previously identified. (*Id.*)

In his application for disability insurance benefits, plaintiff indicated a broader range of ability. (R. 142-159.) He stated that he jogged (R. 142), and shopped (R. 145.) He stated that he drives, though not in the evening. (R. 144, 155.) He also included watching television and movies as well as reading the Bible as part of his regular activities. (R. 153.)

**B.  Medical Evidence**

    **1.  Medical Evidence Prior to Alleged Onset Date**

On March 27, 2006, plaintiff visited the Catholic Medical Centers of Brooklyn and Queens ("CMCBQ") complaining of blurry vision for the past month. (R. 211-12, 231-32, 238, 261, 286-87.) The doctor diagnosed him with uncontrolled diabetes mellitus due to non-compliance with treatment. (R. 211.) The doctor prescribed Insulin and recommended an 1800 calorie diet. (*Id.*) On April 3, 2006, plaintiff visited the CMCBQ for a follow-up appointment. (R. 210, 230, 263, 391.) Plaintiff stated that he had taken his insulin regularly, but that he had

not checked his blood sugar levels, as required for diabetic patients, because he hated sticking himself with a needle. (*Id*.) Plaintiff's blood sugar was high and the doctor diagnosed him with uncontrolled diabetes mellitus, indicating that plaintiff had not been taking his medication. (*Id*.) Plaintiff failed to attend his follow-up appointments in April and May 2006. (R. 206-07.)

On June 26, 2006, plaintiff visited the emergency room at Flushing Hospital, complaining of headaches, redness in his left eye, and photophobia. (R. 305-06.) The doctor diagnosed him with acute glaucoma and diabetes. (*Id*.) The doctor requested a consult with Dr. Robert Rothstein, an ophthalmologist. (*Id*.) Dr. Rothstein diagnosed plaintiff with acute neovascular glaucoma due to uncontrolled diabetes, severe proliferation diabetic retinopathy, and cataracts in both eyes. (*Id*.) Dr. Rothstein prescribed Diamox, and recommended laser surgery for both eyes. (*Id*.) The following day, plaintiff visited Dr. Kenneth Wald, who evaluated plaintiff's retinopathy. (R. 307, 291-92.) Dr. Wald discovered widespread ischemic disease and neovascular proliferation in the left eye more than the right. (*Id*.) He diagnosed plaintiff with proliferative diabetic retinopathy in both eyes, rubeotic glaucoma in the left eye, and diabetic macular edema in both eyes. (*Id*.) Plaintiff underwent laser surgery on his left eye later that day. (R. 287-90, 293-302, 309.)

On June 28, 2006, Dr. Rothstein examined plaintiff. (R. 310-13.) Plaintiff's vision was 20/30 in his right eye, 20/60 in his left eye. (R. 310.) Plaintiff stated that he was reluctant to undergo surgery on this right eye, and Dr. Rothstein explained the risks associated with foregoing surgery. (R. 313.) Plaintiff failed to attend his follow-up appointment and was nonresponsive to requests to reschedule. (R. 313.) Plaintiff attended a follow-up appointment on July 12, 2006. (R. 317-20.) Plaintiff's vision was 20/25 in his right eye, and 20/150 in his left eye. (*Id.*) Dr. Rothstein diagnosed plaintiff with neovascular glaucoma in the left eye, and

proliferative diabetic retinopathy in both eyes. (R. 320.) Dr. Rothstein noted that plaintiff was not taking his medications, and that plaintiff should be able to return to work in one month. (R. 320, 322.)

On July 17, 2006, plaintiff had a second laser procedure on his left eye. (R. 324-27.) Plaintiff's vision was 20/25 in the right eye and 20/150 in his left eye. (R. 324, 326.) The surgery for plaintiff's right eye was scheduled for July 19, 2006; however, plaintiff failed to attend. (R. 328, 330.) Dr. Rothstein contacted plaintiff repeatedly, explaining the risks associated with foregoing treatment, including blindness in both eyes. (R. 332.) Plaintiff contacted Dr. Rothstein on July 25, 2006, stating that his vision worsened with the surgeries. (R. 333.) Dr. Rothstein again explained the risks of not having the surgery. (*Id.*) Plaintiff refused to return to the office and Dr. Rothstein referred him to New York Eye and Ear Infirmary ("NYEE"). (*Id.*)

On July 26, 2006, plaintiff visited the CMCBQ, complaining of a decline in vision in his left eye. (R. 204-05.) He stated that he had not been taking his Insulin or checking his blood sugar levels because he had been working overtime during the past month. (*Id.*) He also complained of headaches. (*Id.*) The doctor referred plaintiff to an ophthalmologist, and encouraged plaintiff to check his blood sugar levels and to take Insulin. (R. 204-05.) On July 29, 2006, Dr. Rothstein wrote to plaintiff, reiterating the need for urgent treatment. (R. 336.)

    **2.**    **Medical Evidence Since August 1, 2006**

On September 22, 2006, plaintiff visited the CMCBQ for a follow-up appointment. (R. 200-02.) He told the doctor that the optometrist said that nothing could be done for his vision. (R. 202.) He visited the clinic again on October 6, 2006. (R. 272-73.) He was given a prescription, placed on a diet, and reminded to check his blood sugar levels. (*Id.*)

On November 2, 2006, plaintiff returned to Dr. Rothstein. (R. 338-39, 342-43.) Plaintiff's vision was 20/30 in the right eye, and no light perception in the left. (R. 342.) Dr. Rothstein explained to plaintiff that without aggressive and urgent care, he would lose vision in his right eye. (R. 340-41.) Dr. Rothstein referred plaintiff to another ophthalmologist, as plaintiff blamed Dr. Rothstein for his vision loss. (R. 240.) Dr. Rothstein wrote prescriptions, but plaintiff left without them. (R. 346-47, 349.) On November 7, 2006, plaintiff took a disability form to Dr. Rothstein and obtained the prescriptions for the medications. (R. 335-53.)

On November 17, 2006, plaintiff visited CMCBQ for a follow-up visit for his diabetes mellitus, hypertension, and elevated cholesterol. (R. 196, 198.) Plaintiff stated that he was blind in his left eye from diabetes complications. (R. 198.) The doctor determined that plaintiff's diabetes was uncontrolled, and prescribed an increased Insulin dosage, and a strict diet. (*Id.*)

On December 28, 2006, plaintiff and Dr. Rothstein spoke on the telephone. (R. 354-55.) Plaintiff accused Dr. Rothstein of blinding him with the laser and threatened to choke him. (R. 354.) Plaintiff refused to see another ophthalmologist. (*Id.*)

On March 9, 2007, plaintiff visited the CMCBQ clinic, complaining of headaches and a runny nose. (R. 404-05.) Plaintiff's diabetes was moderately controlled at that time. (R. 404.) Plaintiff returned with similar complaints one week later. (R. 242.)

On April 30, 2007, plaintiff visited Dr. Jeffrey Shakin, who specializes in diseases and surgery of the retina and vitreous. (R. 416.) Plaintiff's vision was 20/50 for his right eye and no light perception for his left eye. (*Id.*) Dr. Shakin diagnosed plaintiff with proliferative diabetic retinopathy and neovascularization of the iris, the left more than the right. (*Id.*) Dr. Shakin performed a laser treatment on plaintiff's right eye. (*Id.*) Plaintiff visited Dr. Shakin for several follow-up appointments. (R. 430-39, 416.)

On June 5, 2007, plaintiff visited the CMCBQ clinic, complaining of fatigue, headaches, and blurry vision in his right eye. (R.406-07.) The doctor diagnosed plaintiff with poorly controlled hypertension with headaches, and depression. (*Id*.) Plaintiff returned on June 26, 2007, complaining of tingling in his feet. (R. 409-10.) Plaintiff had not taken Insulin since his last visit and had not checked his blood sugar level because he misplaced his glucometer. (*Id*.) Plaintiff was encouraged to seek counseling and to see a podiatrist. (*Id*.) Plaintiff saw Dr. Shakin several times in July and August 2007. (R. 440-47, 449, 452, 455.) The corrected vision of his right eye varied between 20/30 and 20/40 at the appointments. (*Id*.)

On July 9, 2007, plaintiff returned to the CMCBQ clinic, complaining of heaviness in his lower extremities. (R. 412-13.) He reported that he had missed yet another appointment with a podiatrist and still had not scheduled an appointment with a psychiatrist. (R. 412.) The doctor diagnosed plaintiff with pedal neuropathy and uncontrolled diabetes mellitus. (*Id*.)

On January 10, 2008, plaintiff visited Dr. Shakin. (R. 424, 448.) Plaintiff's corrected vision was 20/50 in his right eye. (*Id*.) Dr. Shakin concluded that plaintiff's right eye was stable and indicated that plaintiff could return to work. (*Id*.) Plaintiff visited Dr. Shakin for a series of follow-up appointments in June 2008. (R. 450-51, 457.)

On July 8, 2008, Dr. Shakin prepared a vision impairment questionnaire, provided to him by plaintiff's counsel. (R. 459-64.) Dr. Shakin noted that plaintiff had proliferative diabetic retinopathy, neovascular glaucoma and a history of macular edema in both eyes. (R. 459.) Dr. Shakin opined that any activity requiring visual acuity was limited by plaintiff's impairment. (R. 461.) He concluded that plaintiff was monocular, with severely compromised vision in the right eye. (R. 463.) His conclusions applied to the period since April 30, 2007. (R. 464.)

### 3. Consultative Examinations

On February 17, 2007, Dr. Robert Zoltan, an ophthalmologist, consultatively examined plaintiff. (R. 357-58.) Plaintiff's vision, with correction, was 20/40 in the right eye and only light perception in the left eye. (*Id*.) He concluded that plaintiff was blind in his left eye, and the prognosis for plaintiff's right eye was guarded. (*Id*.)

On February 21, 2007, Dr. Luke Han consultatively examined plaintiff. (R. 361-65.) Plaintiff complained of his vision issues and itchiness between his toes, but no numbness. (R. 361.) Plaintiff stated that he spent his time listening to the radio, reading, taking walks, and pursuing his hobby of collecting die-cast trucks and buses. (R. 362.) Dr. Han diagnosed plaintiff with obesity, hypertension, insulin dependent diabetes mellitus, diabetic retinopathy and cataract. (R. 363.) He concluded that plaintiff was restricted from activities that required acute vision. (*Id*.)

### 4. Medical Evidence Submitted After the Hearing

On September 8, 2008, plaintiff visited the CMCBQ clinic, complaining of pain and swelling in his ankles. (R. 495-96.) He was diagnosed with worsening diabetic neuropathy, and uncontrolled diabetes mellitus and hypertension due to noncompliance. (*Id*.) On October 6, 2008, Dr. Shakin wrote to plaintiff's counsel, summarizing plaintiff's past medical history and concluding that plaintiff's vision in his right eye was "essentially legal blindness and he should be entitled to social security benefits." (R. 635.) Subsequently, plaintiff was admitted to emergency rooms periodically for uncontrolled diabetes mellitus. (R. 493-94, 499-502, 512, 519, 651-89, 694-739, 740-82.) During each of these visits he admitted that he had not been taking Insulin and stated that he was noncompliant because he could not afford the prescriptions.

On February 10, 2010, plaintiff visited Dr. Feig, a retina specialist. (R. 766.) Plaintiff's corrected vision in his right eye was 20/100 and Dr. Feig recommended laser surgery. (*Id*.) On February 19, 2010, Dr. Stephen Kornfeld, of the Lutheran Medical Center, submitted a letter discussing his prior treatment of plaintiff and stating that he supported plaintiff's disability application due to plaintiff's mobility limitations and multiple health problems. (R. 647.)

## DISCUSSION

**A.     Standard of Review**

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 405(g). A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F. 3d 496, 504 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health & Human Servs.,* 685 F. 2d 751, 755 (2d Cir. 1982) (internal quotations omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand

by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F. 3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F. 3d 770, 774 (2d Cir. 1999).

**B.      Disability Claims**

To receive disability benefits, claimants must be "disabled" within the meaning of the Act. *See* 42 U.S.C. § 423(a), (d). Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F. 2d 638, 642 (2d Cir. 1983). ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. § 404.1520. If at any step, the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends there. First, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. § 404.1520(b). Second, the ALJ considers whether the claimant has a "severe impairment,"

without reference to age, education or work experience. Impairments are "severe" when they significantly limit a claimant's physical or mental "ability to conduct basic work activities." 20 C.F.R. § 404.1520(c). Third, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in Appendix 1.[2] *See* 20 C.F.R. § 404.1520(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's "residual functional capacity" ("RFC") in steps four and five. 20 C.F.R. § 404.1520(e). In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant work." 20 C.F.R. § 404.1520(e). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience. If so, the claimant is not disabled. 20 C.F.R. § 404.1520(f). At this fifth step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work. *See Draegert v. Barnhart*, 311 F. 3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F. 2d at 642).

**C.     ALJ's Decision**

On September 17, 2008, the ALJ issued his decision denying plaintiff's claim. (R. 43-54.) At the first step, the ALJ found that plaintiff had not worked since his alleged onset date, August 1, 2006. (R. 48.) At the second step, the ALJ concluded that plaintiff suffered from two severe impairments: blindness of the left eye and diabetes mellitus. (R. 48.) At the third step, the ALJ concluded that these impairments in combination or individually did not meet or equal a listed impairment. (R. 49.) At the fourth step, the ALJ determined that plaintiff was not able to perform his past relevant work as a bus driver or bus maintenance worker. (R. 52.) The parties do not dispute these findings.

---

[2]     20 C.F.R. pt. 404, subpt. P, app. 1.

At the fifth step, the ALJ concluded that plaintiff has the residual functional capacity ("RFC") to perform light work, but not work that requires good bilateral vision and that plaintiff must avoid unprotected heights and moving dangerous machinery. (R. 49.) It is the ALJ's findings in support of this conclusion that are at issue in the instant action.

**D. Application**

Plaintiff moved for judgment on the pleadings, contending that: (i) the ALJ failed to follow the treating physician rule, (ii) the ALJ improperly discredited plaintiff's testimony regarding his symptoms and limitations, and (iii) the ALJ relied on flawed VE testimony. The government moved for judgment on the pleadings, seeking affirmance of the Commissioner's determination.

**1. Treating Physician Rule**

A treating source's medical opinion regarding the nature and severity of an impairment is given controlling weight when supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Schisler v. Sullivan*, 3 F. 3d 563, 567 (2d Cir. 1993) (*citing* 20 C.F.R. 404.1527(d)). When a treating source's opinion is not given *controlling* weight, the proper weight accorded depends upon several factors, including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Clark v. Comm'r of Social Security*, 143 F. 3d 115, 118 (2d Cir. 1998) (citing 20 C.F.R. § 404.1527(d)). Additionally, the ALJ must always "give good reasons" in her decision for the weight accorded to a treating source's medical opinion. *Id*. There are, however, certain decisions reserved to the Commissioner. Such decisions include the determination that a

claimant is "disabled" or "unable to work."  20 C.F.R. § 404.1527(e)(1).  "That means that the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.  A treating physician's statement that the claimant is disabled cannot itself be determinative."  *Snell v. Apfel*, 177 F. 3d 128, 133 (2d Cir. 1999).

Plaintiff's medical history is extensive.  Plaintiff has treated with numerous doctors in different specialties since 2006.  To summarize the medical evidence, plaintiff suffers from uncontrolled diabetes mellitus, which has caused numerous secondary conditions, such as the blindness in plaintiff's left eye, the declined vision in plaintiff's right eye, and mobility issues related to pain and swelling in his legs and feet.  The issue in this case is whether plaintiff's right eye condition has deteriorated sufficiently to merit a finding that he is unable to perform the light duty work the VE suggested.  With respect to the medical evidence submitted to the ALJ before the hearing, the corrected vision in plaintiff's right eye vacillated from appointment to appointment with an average range of 20/30 to 20/70.  The condition of plaintiff's right eye was described as "guarded."  There is one report from Dr. Shakin, one of plaintiff's treating physicians, that concluded that plaintiff's right eye is "severely compromised."  (R. 463.)  This report is central to the dispute between the parties.

The ALJ indicated that he did not give controlling weight to Dr. Shakin's conclusion.  (R. 52.)  The ALJ supported this finding by explaining that the medical evidence on a whole did not support Dr. Shakin's conclusion, nor did Dr. Shakin's prior findings as discussed in medical records, or plaintiff's statements to treating physicians or plaintiff's testimony regarding the activities that he was able to engage in, despite his vision problems.  Contrary to plaintiff's assertions, the ALJ gave ample reason for his decision not to give controlling weight to Dr.

14

Shakin's opinion on the severity of plaintiff's right eye condition. ALJs are required to look at the medical evidence and to make their own determinations as to whether or not an individual is disabled. *See Snell*, 177 F. 3d at 133 ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").

The ALJ set forth valid reasons, supported by the record, for discounting Dr. Shakin's conclusion. First, the medical records indicate that plaintiff's corrected vision was sufficient to enable him to perform the two light duty positions the VE suggested. Second, the ALJ correctly noted that Dr. Shakin's conclusion was not supported by Dr. Shakin's prior medical examinations and treatments of plaintiff. Indeed, on January 10, 2008, nearly a year and a half after the alleged onset date, Dr. Shakin determined that plaintiff's right eye was stable and that plaintiff could return to work. (R. 424, 448.) Third, with respect to the medical evidence submitted prior to the hearing, none of the other physicians who treated plaintiff reached the same opinion regarding the severity of his right eye. Finally, plaintiff's statements to his physicians regarding his activity level corroborate the findings contained in their reports. The ALJ did not err in deciding not to give controlling weight to Dr. Shakin's conclusion regarding the severity of the condition of plaintiff's right eye.

2.   **The ALJ's Findings Concerning Plaintiff's Credibility**

The ALJ found plaintiff's testimony regarding his limitations and his symptoms not credible. (R. 50.) The ALJ noted that: (i) the plaintiff had a history of noncompliance with treatment, (ii) plaintiff's own discussions with his doctors indicated that he engaged in a greater level of activity than discussed in his testimony, and (iii) the medical evidence indicated he could perform the two light duty positions that the VE suggested. Contrary to plaintiff's assertions, the ALJ did not discredit plaintiff's credibility solely because the ALJ determined that plaintiff's

described symptoms and limitations were unsupported by the medical evidence. Rather, the ALJ reviewed the record as a whole, including statements that the plaintiff made to his treating physicians regarding his activity levels, and determined that plaintiff's testimony should be discredited. (R. 50-52.) Indeed, there is at least one documented instance of plaintiff providing false information to a treating physician. (R. 200-02.)

Plaintiff contends that the ALJ erred in not crediting him for his strong work experience. The ALJ did not specifically discuss the duration of plaintiff's career in connection with his credibility findings; however, the ALJ noted that he considered plaintiff's work experience when considering his RFC. Moreover, "work history is just one of many factors that the ALJ is instructed to consider in weighing the credibility of claimant testimony." *Schaal v. Apfel*, 134 F. 3d 496, 502 (2d Cir. 1998). Based on the record before the Court, the ALJ did not err in discrediting the plaintiff's testimony regarding his symptoms and limitations.

### 3. The ALJ's Reliance on VE Testimony

Both the ALJ and plaintiff's counsel posed hypothetical questions to the VE regarding plaintiff's RFC. The VE stated that, if plaintiff's right eye was severely impaired, plaintiff would be unable to perform the two light duty positions the VE suggested; however, if plaintiff's right eye impairment was milder, plaintiff could perform the work in question. (R. 33-39.) As set forth above, the ALJ discredited Dr. Shakin's conclusion that plaintiff's right eye impairment was severe and the Court did not disturb the ALJ's finding. However, the VE did not testify as to whether the vacillation in plaintiff's corrected vision would preclude him from being able to perform the suggested work. Further, since the date of the hearing, two additional treating physicians have opined that plaintiff is disabled. (R. 647, 766.) The VE did not have access to these records at the time he testified. The ALJ issued a thorough and well-reasoned report;

however, given the nature of plaintiff's physical ailments, this case is remanded to give plaintiff the opportunity to submit updated medical records to the ALJ and the VE and for the VE to provide additional testimony regarding the vacillation of plaintiff's vision and to comment on updated medical records.

## CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied. Plaintiff's motion for judgment on the pleadings is granted in part and denied in part. The instant action is remanded pursuant to the fourth and sixth sentences of 42 U.S.C. § 405(g), for additional proceedings consistent with this opinion, specifically, for the ALJ to consider updated medical evidence and additional testimony from the VE regarding plaintiff's updated medical evidence.

SO ORDERED

DATED:   Brooklyn, New York
         March 12, 2012

                                    _____/s/_____
                                       DORA L. IRIZARRY
                                     United States District Judge